UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT    FILED

Ocт 20  7 21 AM '03

JOHN P. CURRY,                          :      CASE NO. 3: 02 CV 1149 (PCD)
                                        :      U.S. DISTRICT COURT
                         Plaintiff,     :      NEW HAVEN, CONN.
v.                                      :
                                        :
ALLAN S. GOODMAN, INC.,                 :
                                        :
                         Defendant.     :      OCTOBER 17, 2003

## REPLY BRIEF TO PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant, Allan S. Goodman, Inc. ("ASG"), hereby replies to Plaintiff's

Memorandum in Opposition to Defendant's Motion for Summary Judgment.

  I.    **Plaintiff's Argument and Factually Unsupported Claims Should be Disregarded.**

Plaintiff's brief is replete with assertions that lack any citation to record evidence

in support thereof.  Such mere conjecture and speculation are insufficient to defeat a

motion for summary judgment.  *See Opals on Ice Lingerie v. Body Lines Inc.*, 320 F.3d

362, 370 n.3 (2d Cir. 2003).  In this regard, Rule 56(e), Fed.R.Civ.P. requires that a

submission filed in opposition to a motion for summary judgment must set forth

statements that would be admissible into evidence.  Conclusory statements and

hearsay is to be disregarded.  *See, e.g., Johnson v. Chesebrough-Pond's USA Co.*, 918

F.Supp. 543, 552 (D. Conn.), *aff'd*, 104 F.3d 355 (2d Cir. 1996).  The following are

examples of such unsupported assertions.

  • Plaintiff states that (i) the "split line" is a full time position at ASG; (ii) there are

    several employees who are assigned to the split line as their full time job; and (iii)

the split line does not require heavy lifting or repetitive bending. (Pl's Memo in Opp., at 3.) There is no support for this in the record, which is evidenced by the lack of a citation to any record evidence. Rather, the record evidence shows that the night shift position is a full time position at ASG and, as such, night shift employees are expected to perform all functions of every position on the shift. *See* Exhibit K, attached to ASG's Memo in Support of Motion for Summary Judgment.[1] The split line is a general area in ASG's warehouse and ASG reasonably expects and requires that its employees be able to lift heavy items and to engage in repetitive bending and lifting. *Id.* As Richard Conroy testified, "the split line was not the sole function" of the warehouse position. *See* Exhibit G at p. 65-66; *see also* Exhibit K.

• Plaintiff states that he has no difficulty reaching up to the high level or down to the low level, and that reaching up and squatting down are within his medical restrictions. (Pl.'s Memo in Opp., at 4.) Plaintiff's own testimony by deposition and/or affidavit, as with Exhibit A to Pl. Memo in Opp., as to his perceived limitations without supporting medical testimony is violative of Rule 56(e) and not sufficient to show that he qualifies for protection under the ADA. *Douglas v. Victor Capital Group*, 21 F.Supp.2d 379, 383 (S.D.N.Y. Oct 13, 1998); *Johnson v. St. Clare's Hospital & Health Center*, 1998 WL 236251 at *8 (S.D.N.Y. May 13, 1998), *aff'd,* 1998 WL 213203 (S.D.N.Y. Apr. 30, 1998) (copy attached hereto as Exhibit R-1). Indeed, contrary to the Plaintiff's current assertions, these were

---

[1] Unless otherwise noted, Exhibits cited herein are to those appended to Def's. Mem. in Supp. of Mot. for Sum. Judg.

2

restrictions issued by his own treating physician.  Plaintiff is not competent to testify as to what medical restrictions are appropriate for his condition, especially when he seeks to counter Dr. Kime's March 7, 2001 opinion.  (Exhibit D at P0224)  Dr. Kime twice operated on Plaintiff and has treated him during all times material to this matter.  Beyond this, it strains logic to believe that reaching up above shoulder level and to a low level below the knee repeatedly throughout the night would not require repetitive reaching and bending – Dr. Kime has restricted Plaintiff from performing these tasks.  (Exhibit D at P0224)

- Plaintiff states that *if* the lines are stocked properly, there should be no reason for him to leave the line during his shift. (Pl's Memo in Opp., at 4, 9.)  Plaintiff is not able to competently testify as to ASG's business, let alone rely on ideal, unrealistic business conditions.  Plaintiff puts an interesting twist on Conroy's deposition testimony, but fails to mention that Conroy testified this would be the case in a rare, perfect world, *not reality.*  (Exhibit G at p. 45-46 to Pl's Memo in Opp.)  In reality, the process does not run smoothly and employees are indeed frequently required to lift boxes in excess of Plaintiff's medical restriction.

- Plaintiff states that it is only once a month that the split line workers are sent over to work on the solid line. (Pl's Memo in Opp., at 5.)  Plaintiff misstates Conroy's testimony. (Exhibit G at p. 55, to Pl's Memo in Opp.).  Conroy testified that it is not uncommon for split line employees (save one who stays behind to clean up) to be assigned to the solid line at least for some period of the night.  (Exhibit G to Pl's Memo in Opp.)  Art Schreiber may have testified that he has only gone to the solid line 12-16 days over the last twelve months.  However, Mr. Schreiber was

3

the most senior person on the night shift and therefore was, by his seniority, in a position to have less senior persons perform the more rigorous tasks on the solid line before he would have to join in there. *See* Schreiber Dep. TR. at 12, attached hereto as Exhibit R-2; Pl's Memo in Opp at 15.

- Plaintiff states that he performed the essential functions of the "split line position." (Pl's Memo in Opp., at p. 11, 12.) Contrary to the Plaintiff's assertions, ASG accommodated the Plaintiff by temporarily assigning him to the split line, by asking other employees to assist him in retrieving full cases, and by not requiring him to load cases on the solid line or onto trucks. ASG also accommodated Plaintiff by redistributing job duties temporarily to other employees who had no medical restrictions. As such, Plaintiff did not perform the essential functions of the job while under his physician's supervision. *See* Exhibit K.

- Plaintiff's letter to ASG, Exhibit Y, is inadmissible. *See United States v. All Right, Title and Interest in Real Property and Appurtenances*, 77 F.3d 648, 657-58 (2d Cir. 1996) (nonmovant's submission of an unsworn letter "was an inappropriate response to the [movant's] motion for summary judgment, and the factual assertions made in that letter were properly disregarded by the court.") Further, the July 7, 2003 "Functional Capacity Evaluation" report by C. DiPasquale and July 23, 2003 Orthopedic Evaluation of Dr. Selden, appended thereto, should both be wholly disregarded as (i) they are prepared by individuals who were not ever disclosed as expert witnesses (and were not Plaitniff's treating physicians), (ii) were not disclosed in response to ASG's discovery requests, (iii) are nowhere to be found in Plaintiff's Initial Disclosures; and (iv) pertain to a time period that is

4

not relevant to Plaintiff's employment termination – it is Plaintiff's physical condition and his medical restrictions in March – April 2001 that govern here rather than any time since then, especially some two years later. Further, these two persons never produced any expert report(s) during the course of discovery in this case during a time when ASG would have had an opportunity to depose them. These reports also cannot be relied on to oppose ASG's motion for summary judgment as they are inadmissible hearsay because they are unsworn. *See Douglas v. Victor Capital Group,* 21 F.Supp.2d 379, 383, 391 (S.D.N.Y. 1998) (two unsworn doctors' letters submitted by an ADA plaintiff were insufficient to defeat summary judgment because they were inadmissible hearsay). Such hearsay is not sufficient to raise an issue of fact for summary judgment purposes. *See Johnson v. NCB Collection Services,* 799 F.Supp. 1298, 1301 (D.Conn.1992*); Zarzycki v. United Technologies Corp.,* 30 F.Supp.2d 283, 290 (D. Conn. 1998).

- Plaintiff argues at Pl Memo in Opp at 23, n.6, that in addition to the major life activities, his allegations that he is substantially impaired in the major life activities of walking, bending, exercising, having sexual relations, traveling and sitting should be taken as true. Plaintiff has submitted no evidence other than mere conjecture that he is substantially limited in these additional areas of his life. ASG addressed the fact that since October 1999 Plaintiff has been able to attend to his own personal hygiene, including bathing, walking and swimming, and therefore is not substantially limited in these major life activities. (*See* Exhibit S at 42; Exhibit D at P0222, P0227.)

## II.    ASG Did Not Fail to Engage in the Interactive Process.

Plaintiff states that in March 2001, he placed himself on the "bid list" asking to be assigned on a full-time permanent basis to the night shift split line position, and that he was high enough on the seniority list that he would have been awarded that job. Further, he states that in so doing he thereby requested an accommodation from ASG; that is, reassignment from his former position of truck driver to the position of split line worker on the night shift.  (Pl's Memo in Opp., at 11.)  Here, unlike the facts in *Lovejoy-Wilson v. Noco Motor Fuel, Inc.*, 263 F.3d 208, 219 (2d Cir. 2001), the record evidence supports the fact that ASG took steps toward engaging in an interactive process.  ASG had spoken to the Union and Plaintiff on several occasions about accommodating Plaintiff based on his medical restrictions.  It is undisputed that ASG accommodated Plaintiff by temporarily assigning him light duty.  To that end, ASG assigned him temporarily to limited split line duties and had other employees assist him by retrieving full cases; Plaintiff was not required to load cases onto the solid line or onto trucks -- essentially, his job duties were temporarily redistributed to other employees who had no medical restrictions.  When ASG received Plaintiff's treating physician's medical opinion that Plaintiff had permanent restrictions, it communicated with Plaintiff and the Union that it appeared that Plaintiff could no longer perform the essential functions of  the job and he should seek retraining.  *See* Exhibit K.  At this time, neither Plaintiff nor the Union suggested any accommodation.

## III.    Plaintiff Is Unable to Perform Essential Functions of the Split Line Job With or Without a Reasonable Accommodation.

Plaintiff asserts what *he* considers to be the essential functions of the job. Plaintiff ignores the fact that others were performing the essential functions of the job for

6

him.  Plaintiff *argues* that lifting 25 pound cases is not an essential function of the job.
Citing only to his self-serving affidavit, he argues that in the rare instance that a case
needs to be lifted, a forklift, shopping cart or hand truck can be used.  Plaintiff ignores
the fact that even to use the forklift, cart or hand truck he would have to lift the case at
some point.  Simply stated, this is a case where Plaintiff's treating physician imposed
permanent restrictions to which Plaintiff objects.  Defendant was constrained to abide by
Plaintiff's physician's restrictions.  Plaintiff's beliefs as to his own abilities are immaterial.

### IV.  Plaintiff's Retaliation Claims Are Pre-Empted Under the *Garmon* Doctrine.

Where the conduct about which a plaintiff complains is "arguably subject to § 7 or
§ 8 of the NLRA," it is within the *exclusive* competence of the NLRB, and a motion to
dismiss for lack of subject matter jurisdiction is appropriate.  *San Diego Bldg. Trades
Council v. Garmon*, 359 U.S. 236, 245, 79 S.Ct. 773, 779-80, 3 L.Ed.2d 775 (1959).
Plaintiff accurately reflects the gravaman of his claim by stating that he filed a union
grievance based on conduct of his supervisor, that the filing of the grievance was
protected activity, that after the grievance was filed, he was retaliated against by ASG,
and there was a causal connection between the protected activity and the adverse
employment action.  (Pl's Memo in Opp., at 38.)  Plaintiff contradicts himself by stating
that the protected conduct he exercised did not arise out of his union membership.  (*Id.*
at 34.)   To the contrary, like *Massachusetts Commission Against Discrimination v.
Chaulk Servs., Inc.,* 70 F.3d 1361 (1st Cir. 1995), *cert. denied*, 518 U.S. 1005 (1996),
Plaintiff has sought relief for an alleged violation that is fundamentally grounded in an
assertion that his rights were interfered with and he was retaliated against because of
his participation in protected union activity.  Accordingly, because the controversy at

issue in the third and sixth counts involves activity that is arguably subject to sections 7 and 8 of the National Labor Relations Act, the National Labor Relations Board alone has jurisdiction over the controversy to the exclusion of this Court.

## V.    Conclusion.

For the foregoing reasons, Defendant's Motion for Summary Judgment should be granted as to the entirety of the Complaint.

ALLAN S. GOODMAN, INC.


By:_____
Glenn A. Duhl ct03644
Siegel, O'Connor, Zangari
     O'Donnell & Beck, P.C.
150 Trumbull Street
Hartford, CT 06103
Tel.: (860) 727-8900
Fax: (860) 527-5131
gduhl@siegeloconnor.com


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Reply Brief to Plaintiff's Memorandum In Opposition to Defendant's Motion for Summary Judgment has been served upon counsel for Plaintiff, John P. Curry, Richard E. Hayber, Esq. and Anthony J. Pantuso III, Esq., Hayber & Pantuso, L.L.C., 221 Main Street, Suite 400, Hartford, CT  06106, by first class mail, postage prepaid, this 17th day of October, 2003.


_____
Glenn A. Duhl

8

1998 WL 236235
(Cite as: 1998 WL 236235 (S.D.N.Y.))

Page 1

☞
Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

James JOHNSON, Plaintiff,
v.
St. Clare's Hospital & Health Center, et al.,
Defendants.

No. 96CIV.1425(MBM)(AJP).

May 13, 1998.

[Pro Se], James Johnson, R.N., Maspeth, for Plaintiff's Counsel.

Barbara E. Hoey, Esq., Kelley Drye & Warren, New York, for Defendant's Counsel.

[Pro Se], Anthony Thomas, Sing Sing Correctional Facility, Ossining, for Plaintiff's Counsel.

[Pro Se], Reginald Williams, Sing Sing Correctional Facility, Ossining, for Plaintiff's Counsel.

Mirna E. Martinez, Esq., Asst. Attorney General, New York, for Defendant's Counsel.

REPORT AND RECOMMENDATION

PECK, Magistrate J.: To the Honorable Michael B. Mukasey, United States District Judge:

*1 Plaintiff James Johnson alleges that defendant St. Clare's Hospital discharged him from his employment as a staff nurse due to his status as a recovering alcoholic and/or due to his autoimmune hepatitis in violation of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act. Defendants have moved for summary judgment. After repeated warnings, Johnson has failed to submit sufficient medical evidence to support his claim. Accordingly, for the reasons set forth below, the Court recommends that defendants' summary judgment motion be granted.

FACTS

*Johnson's Hiring by St. Clare's, and His Duties*

In September 1992, defendant St. Clare's Hospital, an acute-care hospital, hired plaintiff Johnson, a registered nurse, to work as a part-time staff nurse on Saturday and Sunday nights. (Hospital 3(g) Statement ¶¶ 2, 4, 16; Plf's Resp. to Defs' 3(g) Statement ["Johnson 3(g)"] ¶¶ 2, 4, 16.) The essential function of a staff registered nurse is to provide primary nursing care to patients. (Hospital 3(g) ¶ 9; Johnson 3(g) ¶ 9.) Johnson worked approximately eighteen hours per week at St. Clare's. (Hospital 3(g) ¶ 5; Johnson 3(g) ¶ 5.) Johnson also worked an additional twenty hours per week for the Niederlander Company as an usher and ticket-taker when that theater was open. (Hospital 3(g) ¶ 6; Johnson 3(g) ¶ 6.)

At St. Clare's, Johnson was assigned to "4C," one of the hospital's general medical/surgical units. (Hospital 3(g) ¶ 7; Johnson 3(g) ¶ 7.) During his pre-employment interviews, Johnson was told that, like most acute-care hospitals, St. Clare's would require him to "float," i.e., work on other units, when necessary. (Hospital 3(g) ¶ 8; Johnson 3(g) ¶ 8.)

Johnson worked regularly on unit 4C from 1992 to 1995, during which time its 22 beds often were filled. (Hospital 3(g) ¶ 10; Johnson 3(g) ¶ 10.) When full, unit 4C was typically staffed with three nurses: two RNs and a licensed practical nurse. (Hospital 3(g) ¶ 10; Johnson 3(g) ¶ 10.) There were times prior to 1995 when unit 4C was closed due to an insufficient number of patients, and Johnson and other 4C staff were required to float to other units assigned at random. (Hospital 3(g) ¶ 12; Johnson 3(g) ¶ 12.)

*Johnson's Medical Condition*

In August 1994, Johnson was notified by the New York State Education Department ("NYSED") that his license was being placed on probation for "professional misconduct" while working at New York Hospital. (Hospital 3(g) ¶ ¶ 16, 18; Johnson 3(g) ¶¶ 16, 18.) The probation terms required Johnson to have St. Clare's submit written quarterly reports to the NYSED evaluating his professional performance. (Hospital 3(g) ¶ 16; Johnson 3(g) ¶ 16.)

Christine Maloney, St. Clare's Associate Vice

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

EXHIBIT
R-1
ALL-STATE LEGAL®

1998 WL 236235
**(Cite as: 1998 WL 236235 (S.D.N.Y.))**

President of Nursing, met with Johnson in September 1994 to discuss the NYSED determination. (Hospital 3(g) ¶ 18; Johnson 3(g) ¶ 18.) Johnson told her that he was a recovering alcoholic and that his former drinking problem had led to his discharge by New York Hospital and the subsequent NYSED misconduct finding. (Hospital 3(g) ¶ 18; Johnson 3(g) ¶ 18.) Maloney asked Johnson "how things were going." (Hoey Aff. Ex. D: Johnson Dep. at 48.) Johnson responded that he was "doing okay with staying away from drinking" and that he "hadn't used alcohol since the incident in New York Hospital." (Johnson Dep. at 47, 48.) While Johnson explained that he "worked part-time ... to minimize [his] stress" (*id.* at 48), he did not indicate that he needed any modification of his part-time RN duties or other accommodation because of his status as a recovering alcoholic or for any other reason. (Hoey Aff. Ex. G: Maloney Dep. at 152-54.) Further, he did not mention having any other illness. (Hospital 3(g) ¶ 22; Johnson 3(g) ¶ 22.)

*2 Johnson has submitted to the Court in opposition to defendants' motion medical documents diagnosing him as alcohol dependent. (Johnson Br. Ex. 2; Johnson 3/31/97 Reply Exs. 2, 4, 5.) Johnson last consumed alcohol on August 26, 1991. (Hospital 3(g) ¶ 23; Johnson 3(g) ¶ 23.) Johnson suffers from no physical symptoms and takes no medication as a result of his status as a recovering alcoholic. (Hospital 3(g) ¶¶ 24, 28; Johnson 3(g) ¶¶ 24, 28.) Johnson's treatment for his condition involves group therapy with a credentialed alcohol counselor, weekly sessions with a psychologist, and regular attendance at Alcoholics Anonymous meetings. (Hospital 3(g) ¶ 29; Johnson 3(g) ¶ 29.) Johnson's status as a recovering alcoholic has not interfered with his ability to work as a ticket taker at the Niederlander Company and would not prevent him from working in other positions, including as a registered nurse. (Hospital 3(g) ¶ 26; Johnson 3(g) ¶ 26.) Johnson asserts that as a recovering alcoholic he needs to avoid stress, i.e., avoid high patient/nurse ratios (Hoey Aff. Exs. N & Y), but he has offered the Court no medical evidence to support his stress allegations.

Johnson also suffers from autoimmune hepatitis. (Hoey Aff. Ex. N: Dr. Garelick's Note of July, 14, 1995; Johnson Dep. at 29-30; Hospital 3(g) ¶ 30; Johnson 3(g) ¶ 30.) Johnson has never been

hospitalized for this condition, and takes medication to control it. (Johnson Dep. at 30, 32; (Hospital 3(g) ¶ 30; Johnson 3(g) ¶ 30.) This condition causes him to suffer from mild arthritis, resulting in occasional back stiffness which does not restrict his movement, and may result in occasional lethargy. (Johnson Dep. at 33, 35.) Neither his autoimmune hepatitis nor the medication he takes for it interfere with his ability to perform his duties as an RN or ticket taker, nor would they prevent him from fulfilling the duties of any other occupation. (Johnson Dep. at 32-36.)

*Johnson's Work Problems and Termination*

Unit 4C was closed intermittently throughout 1995 due to its low patient count; it was closed for a period of at least six weeks prior to September 17, 1995, during which time, Johnson and other 4C staff members were floated to other units. (Hospital 3(g) ¶¶ 36-37; Johnson 3(g) ¶¶ 36-37.) On September 17, 1995, Ms. Rizzitiello, the night nursing supervisor, assigned Johnson to work on "4 McNally," one of St. Clare's other medical/surgical units. (Hospital 3(g) ¶¶ 38-39; Johnson 3(g) ¶¶ 38-39; Johnson Dep. at 129-31.) Two RNs and two aides were assigned to care for the unit's 19 patients that night. (Johnson Dep. at 132-33, 226.) Upon learning of the staffing, Johnson informed Rizzitiello that "we needed somebody else." (*Id.* at 133.) Rizzitiello responded that "she didn't have anybody." (*Id.*) Johnson then "informed [Rizzitiello] that [he] wasn't going to accept the assignment." (*Id.*) After orally refusing the assignment, Johnson submitted the following writing, which stated, in full:

*3 To whom it may concern,
   When I realized that my assignment on 4 mc was more than I could safely handle I notified my supervisor and did not accept the assignment.

(Hoey Aff. Ex. P.) This writing made no mention of any disability or illness. (*Id.*) [FN1]

> FN1. Johnson did not file a "Notice of Unsafe Staffing" form, the established procedure for addressing inadequate staffing situations. (Hospital 3(g) ¶¶ 50-51; Johnson 3(g) ¶¶ 50-51.) He did not do so because that procedure would have required him to work the shift and "grieve" to the union about staffing levels

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

after, and Johnson did not feel that he could work the shift because of his disability. (*See* Johnson Dep. at 151.)

On September 20, 1995, Johnson was suspended without pay for two days as a result of this incident. (Hospital 3(g) ¶ 52; Johnson 3(g) ¶ 52.)

On October 9, 1995, Johnson met with Marilyn Hale, Vice President of Nursing/Patient Services, and Christine Maloney, Associate Vice President of Nursing, to discuss his suspension. (Johnson Dep. at 149; Hospital 3(g) ¶ 53.) According to Johnson:

> At that [October 9] meeting I informed Miss Maloney and Miss Hale that I didn't work part-time because I didn't need money, I did it because I had to minimize my stresses. I informed them that I was a recovering alcoholic and that I had autoimmune hepatitis and that I wasn't able to take an assignment that was beyond my abilities.

(Johnson Dep. at 150.)

On October 17, 1995, Johnson submitted a letter requesting a leave of absence from work at St. Clare's until the first week of December because:

> The stress caused by floating due to our floor being closed and the recent events that lead to my suspension and my transfer being denied have had a negative effect on me.

(Hoey Aff. Ex. T; *see* (Hospital 3(g) ¶¶ 56-57; Johnson 3(g) ¶¶ 56-57.) Along with the letter, Johnson submitted Dr. Garelick's July 14, 1995 Note, which explained that Johnson had autoimmune hepatitis, for which he was taking medication, and which was in "biochemical remission." (Hoey Aff. Ex. N.) Written beneath this doctor's note was a personal note from Johnson, dated October 17, 1995, reading, in full, as follows:

> Nsg. Dept.
> Due to my autoimmune hepatitis & other chronic illness known to the nursing dept. I was unable to work due to stress caused by the recent situation that lead to my suspension. If you need to talk to my psychologist please let me know.

(Hoey Aff. Ex. N; *see* Hospital 3(g) ¶¶ 58-59; Johnson 3(g) ¶¶ 58-59.) Johnson's request for leave was granted by St. Clare's, effective October

18 through December 8, 1995. (Hoey Aff. Ex. U; *see* Hospital 3(g) ¶ 61; Johnson 3(g) ¶ 61.)

On December 9, 1995, Johnson reported back to work and Ms. Rizzitiello assigned him to "5 McNally," a general medical/surgical unit containing 23 patients on that night. (Hospital 3(g) ¶ 66; Johnson 3(g) ¶ 66.) The staff consisted of two RNs and two nurse aides. (*Id.*) Johnson decided that the assignment was beyond his abilities and asked Rizzitiello whether additional staffing would be assigned. (Hospital 3(g) ¶¶ 67-68; Johnson 3(g) ¶¶ 67-68.) When Rizzitiello said no, Johnson refused the assignment, and he was immediately suspended. (Hospital 3(g) ¶¶ 68-69, 72; Johnson 3(g) ¶¶ 68-69, 72.) Following this incident, Johnson wrote:

> *4 Since this was the first day for me to return to work post an incident when I informed the supervisors that I couldn't take care of more than 10 [patients] I was surprised to find out that I was placed in the same situation.
> The nursing office was informed that I could not in good faith take an assignment that I felt that I could not handle or that would jeopardize the [patients'] health and safety.

(Hoey Aff. Ex. Y.)

On December 18, 1995, St. Clare's informed Johnson that he was discharged for his actions of December 9. (Hospital 3(g) ¶ 73; Johnson 3(g) ¶ 73.) In a letter dated December 18, 1995 to Mr. Ronald Pancotti, Vice President of Human Resources at St. Clare's, Johnson wrote, in full:

> In the beginning of 1995 I brought it to the attention of Ms. Maloney, V.P. of Nursing at St. Clares, that I was an employee with a handicap within the meaning of the law. Until now I have not found it necessary to request any accommodations to make it possible for me to do my job. The purpose of this letter is to inform you that due to the change in my job description by St. Clares I must now request an accommodation.
> The recent situations in which the hospital has asked me to perform duties beyond my abilities and beyond contracted nurse:patient ratios is something that not only endangers my health but the health of the patients.
> I know that there is something that can be done to accommodate me and fill one of your nursing positions to satisfy both our needs. I am flexible

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

with what I need to be accommodated such as a transfer, allow me to select the position I am best suited for prior to the start of the shift or if necessary to furlough me while my unit is closed so I am not a "float nurse", (a stressful position which I did not hire on for). This can be worked out prior to my return to work.

Please check my evaluations and you can see that I am qualified for most positions in your hospital.

(Hoey Aff. Ex. W.) It is disputed whether Johnson's December 18, 1995 letter was submitted to Pancotti before or after Johnson's termination on that same day. (*Compare* Hospital 3(g) ¶ 74 *with* Johnson 3(g) ¶ 74.)

St. Clare's determined that the requested accommodations were not feasible. (Hoey Aff. Ex. B: Pancotti Dep. at 107-11; Hoey Aff. Ex. F: Taylor Dep. at 109-12; *see* Hospital 3(g) ¶ 76.) In a letter dated December 26, 1995, John Scarfone, Vice President and General Counsel of St. Clare's, responded to Johnson's December 18 letter:

We are not entirely clear as to the nature of your claimed "handicap" or what "accommodation" you claim to require. The only thing we are aware of through our obligation to file reports with the State Office of Professional Discipline is that you had a problem with alcohol, which was overcome.

There are also several misstatements in your letter. First, at no time prior to your termination was there any "change in [your] job description". You were employed as a staff nurse at St. Clare's throughout your employment. In addition, at no time during your employment were you asked to take on assignments which were "beyond [your] abilities" or would have endangered the health of any patient of this hospital or your health. The work assignments you were given were appropriate.

*5 As you are aware, you were terminated from your position at St. Clare's for gross misconduct, which included insubordination and abandonment of your duties. This was conduct that you had been suspended for previously on or about September 23, 1995. At no time prior to your termination did you inform the Hospital that you required any sort of "accommodation". We do not see how we could "accommodate" misconduct of the type you engaged in on December 9, 1995.

In light of the above, we cannot reinstate you to

your position at St. Clare's.

(Hoey Aff. Ex. X.) Johnson disputes that the accommodations he requested are not feasible. (Johnson 3(g) ¶¶ 77-80.)

ANALYSIS
I. *SUMMARY JUDGMENT STANDARDS*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986); *Lang v. Retirement Living Pub. Co.,* 949 F.2d 576, 580 (2d Cir.1991); *Hernandez v. New York City Law Dep't Corp, Counsel,* 94 Civ. 9042, 1997 WL 27047 at *6 (S.D.N.Y. Jan.23, 1997) (Peck, M.J.); *Burger v. Litton Indus., Inc.,* 91 Civ. 0918, 1996 WL 421449 at *7 (S.D.N.Y. April 25, 1996) (Peck, M.J.), *report & rec. adopted by* 1996 WL 609421 (S.D.N.Y. Oct.22, 1996). The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment, here, the defendants. *See, e.g., Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 36 (2d Cir.1994); *Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1223 (2d Cir.1994); *Hernandez v. New York City Law Dep't Corp. Counsel,* 1997 WL 27047 at *6; *Burger v. Litton,* 1996 WL 421449 at *7.

In evaluating the record to determine whether there is a genuine issue as to any material fact, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. at 2513; *see also Chambers v. TRM,* 43 F.3d at 36; *Gallo v. Prudential,* 22 F.3d at 1223; *Hernandez v. New York City Law Dep't Corp. Counsel,* 1997 WL 27047 at *6. The Court draws all inferences in favor of the nonmoving party--here, Johnson--only after determining that such inferences are reasonable, considering all the evidence presented. *See, e.g., Apex Oil Co. v.*

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

*DiMauro*, 822 F.2d 246, 252 (2d Cir.), *cert. denied*, 484 U.S. 977, 108 S.Ct. 489 (1987); *Hernandez v. New York City Law Dep't Corp. Counsel*, 1997 WL 27047 at *6; *Burger v. Litton*, 1996 WL 421449 at *7. "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers v. TRM*, 43 F.3d at 37; *see also, e.g., Hernandez v. New York City Law Dep't Corp. Counsel*, 1997 WL 27047 at *6.

**\*6** In considering a motion for summary judgment, the Court is not to resolve contested issues of fact, but rather is to determine the existence of any disputed issues of material fact. *See, e.g., Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 58 (2d Cir.1987); *Knight v. United States Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 1907 S.Ct. 1570, 94 L.Ed.2d 762 (1987); *Ruiz v. Selsky*, 96 Civ.2003, 1997 WL 137448 at *3 (S.D.N.Y. March 24, 1997) (Peck, M.J.). To evaluate a fact's materiality, the substantive law determines which facts are critical and which facts are irrelevant. *Anderson v. Liberty Lobby*, 477 U .S. at 248, 106 S.Ct. at 2510. While "disputes over facts that might affect the outcome of a suit under the governing law will properly preclude the entry of summary judgment[,][f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citations omitted); *see also, e.g., Knight*, 804 F.2d at 11-12; *Shaw v. City of New York*, 95 Civ. 9325, 1997 WL 187352 at *2 (S.D.N.Y. April 15, 1997) (Peck, M.J.); *Ruiz v. Selsky*, 1997 WL 137448 at * 3.

The Court recognizes that it must "extend extra consideration" to pro se plaintiffs such as Johnson; pro se parties are "to be given 'special latitude on summary judgment motions." ' *Reyes v. Koehler*, 815 F.Supp. 109, 112 (S.D.N.Y.1993) (quoting *McDonald v. Doe*, 650 F.Supp. 858, 861 (S.D.N.Y.1986)); *see also, e.g., Valentine v. Honsinger*, 894 F.Supp. 154, 156 (S.D.N.Y.1995); *Gabai v. Jacoby*, 800 F.Supp. 1149, 1153 (S.D.N.Y.1992).

## II. *JOHNSON HAS NOT PRESENTED ANY MEDICAL EVIDENCE THAT HE IS "HANDICAPPED" IN TERMS OF JOB STRESS*

In analyzing claims under the ADA and the Rehabilitation Act, courts apply the three step

analytical framework first set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and later refined in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *See, e.g. Heilwell v. Mount Sinai Hosp.*, 32 F.3d 718, 721-22 (2d Cir.1994) (applying *McDonnell Douglas* analysis in Rehabilitation Act case), *cert. denied*, 513 U.S. 1147, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995); *Duprey v. Prudential Ins. Co. of America*, 910 F.Supp. 879 (N.D.N.Y.1996) (applying *McDonnell Douglas* analysis in ADA case). The three-step analysis is as follows:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Burdine*, 450 U.S. at 252-53, 101 S.Ct. at 1093 (quoting and citing *McDonnell Douglas* ); *see also, e.g., Heilwell v. Mount Sinai Hosp.*, 32 F.3d at 722; *Hernandez v. New York City Law Dep't Corp. Counsel*, 1997 WL 27047 at *12 (citing cases).

**\*7** Johnson "is not required to prove [his] prima facie case by a preponderance of the evidence on motion for summary judgment"; he need only produce "evidence sufficient to support a reasonable inference of the existence of the fact at issue." *Foster v. Arcata Assoc., Inc.*, 772 F.2d 1453, 1459 (9th Cir.1985), *cert. denied*, 475 U.S. 1048, 106 S.Ct. 1267, 89 L.Ed.2d 576 (1986); *see also, e.g., Aquinas v. Federal Express Corp.*, 940 F.Supp. 73, 77 (S.D.N.Y.1996); *Kotlowski v. Eastman Kodak Co.*, 922 F.Supp. 790, 796 (W.D.N.Y.1996).

To establish a prima facie case under either the ADA or the Rehabilitation Act, Johnson "must show: (1) that [he] is a handicapped person under the disability acts; (2) that [he] is otherwise qualified to perform [his] job; (3) that [he] was discharged because of [his] handicap; and, with respect to Rehabilitation Act claims, (4) that the employer is a recipient of Federal financial

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

assistance." *Wernick v. Federal Reserve Bank of New York,* 91 F.3d 379, 383 (2d Cir.1996); *see also, e.g., Borkowski v. Valley Cent. School Dist.,* 63 F.3d 131, 135 (2d Cir.1995); *Heilwell v. Mount Sinai Hosp.,* 32 F.3d at 722.

"In order to demonstrate that [he] is handicapped [under either the ADA or the Rehabilitation Act], [he] must prove two elements: (1) that [he] has a physical or mental impairment; and (2) that such impairment substantially limits one or more of [his] major life activities." *Wernick v. Federal Reserve Bank of New York,* 91 F.3d at 383; *accord, e.g., Heilwell v. Mount Sinai Hosp.,* 32 F.3d at 722.

To satisfy the first prong of the test for handicap, Johnson has offered some medical evidence that he is a "recovering alcoholic" who is "alcohol dependent." (*See, e.g.,* Johnson Br. Ex. 2; Johnson 3/31/97 Reply Br. Exs. 2, 4, 5.) Medical testimony is necessary to support such a claim. *See Clowes v. Terminix Int'l, Inc.,* 109 N.J. 575, 538 A.2d 794, 806 (N.J.1988) ("medical testimony is required to establish the fact of the employee's alcoholism"), *interpreted by Gaul v. AT & T, Inc.,* 955 F.Supp. 346, 349 (D.N.J.1997); *Connecticut Gen. Life Ins. Co. v. Department of Indus., Labor & Human Relations,* 86 Wis.2d 393, 273 N.W.2d 206, 212-13 (Wis.1979) (proof of alcoholism requires medical testimony; employees testimony is not sufficient); *Greater Cleveland Reg'l Transit Auth. v. Ohio Civil Rights Comm'n,* 58 Ohio App.3d 20, 567 N.E.2d 1325, 1327 (Ohio Ct.App.1989) ("In order to prove that a person is an alcoholic, the commission must present evidence that consists of more than just the self-serving statements of the person claiming the handicap.... There must be, at a minimum, medically qualified evidence to support a finding that a person is an alcoholic."). These cases support the conclusion that alcoholism is a handicap. Because Johnson has failed to satisfy the second prong by demonstrating that his "impairment substantially limits one or more of [his] major life activities," *Wernick v. Federal Reserve Bank of New York,* 91 F.3d at 383, the Court need not decide if being a "recovering alcoholic" is a physical or mental impairment that satisfies the first prong of the test for having a cognizable handicap. [FN2]

FN2. The Court recognizes that the ADA and the Rehabilitation Act cover mental as

well as physical impairments, and that the EEOC on March 25, 1997 issued "Enforcement Guidelines" as to application of the ADA to individuals with psychiatric disability. (EEOC Notice No. 915.002.) The defect in Johnson's case, however, is that he has not presented any medical evidence that his status as a recovering alcoholic, even if considered a mental impairment, limits one or more major life activities.

**\*8** Johnson has failed to provide the Court with any *medical* evidence demonstrating that any impairment he has limits one or more major life activities, despite the Court repeatedly warning Johnson of the ramifications of a failure to do so. The Second Circuit has instructed that "[a] district court's failure to notify a pro se plaintiff of the consequences of a failure to respond to a motion for summary judgment is reversible error." *Grabois v. Jones,* 89 F.3d 97, 99 n. 3 (2d Cir.1996); *see also Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996); *Ruotolo v. Internal Revenue Serv.,* 28 F.3d 6, 8-9 (2d Cir.1994). This Court therefore warned Johnson of the consequences of failing to submit evidence in opposition to defendants' motion. [FN3]

FN3. The Court notified Johnson as follows:
Plaintiff pro se is advised to carefully read Rule 56 of the Federal Rules of Civil Procedure. Plaintiff is further advised that, pursuant to Rule 56(e) of the Federal Rules of Civil Procedure, when a motion for summary judgment is made and properly supported, plaintiff may not simply rely upon the complaint, but plaintiff must respond by affidavits or as otherwise provided in that rule, setting forth specific facts showing that there is a genuine issue of material fact for trial. Any factual assertions in defendants' affidavits will be accepted by the Court as being true unless plaintiff submits affidavits or other documentary evidence contradicting defendants' assertions. If plaintiff does not so respond, summary judgment, if appropriate, may be entered against plaintiff. If summary judgment is granted against plaintiff, the case will be

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

dismissed and there will be no trial.

Note also that Local Civil Rule 3(g) of the United States District Court for the Southern and Eastern Districts of New York requires plaintiff to include a separate short and concise statement of any material facts as to which plaintiff contends there exists a genuine issue. In the absence of such a statement, all material facts set forth in defendants' Rule 3(g) statement will be deemed admitted.

Failure to respond to defendants' summary judgment motion may result in the grant of summary judgment for defendant, ending plaintiff's case.

(Order dated January 31, 1997.)

Despite this warning, Johnson failed to submit satisfactory medical evidence to the Court. Still reluctant to grant summary judgment against this pro se plaintiff, the Court issued an even more specific warning, advising Johnson of the need to submit "*specific medical evidence* substantiating: (1) that he suffers from the conditions of which he complains and (2) the *particular limitations* which these conditions place upon his capabilities." [FN4]

FN4. The Court's second warning order read as follows:
The Court has previously warned plaintiff Johnson of the need to present admissible evidence to create material fact issues in opposition to defendants' summary judgment motion. (Order, dated Jan. 31, 1997.) Johnson, however, has provided no medical evidence in opposition to defendants motion. While perhaps the Court can be accused of giving Johnson too much pro se benefit of the doubt, the Court nevertheless is reluctant to grant summary judgment against Johnson without providing him this one last opportunity to present the Court with *specific medical evidence* substantiating: (1) that he suffers from the conditions of which he complains and (2) the *particular limitations* which these conditions place upon his capabilities. Johnson's own deposition testimony will not suffice to carry his burden of establishing a prima facie case.

Johnson must present the Court with medical evidence (in admissible form) in opposition to defendants' summary judgment motion by April 1, 1997; otherwise the Court will recommend that defendants' summary judgment motion should be granted.

(Order dated March 12, 1997, citations & fn. omitted.)

"Although pro se plaintiffs are entitled to 'special latitude,' when defending against summary judgment motions, absent a showing of 'concrete evidence from which a reasonable juror could return a verdict in [the non-moving party's] favor,' summary judgment must be granted to the moving party. Evidence which is merely 'colorable, conclusory, speculative or not significantly probative' is insufficient to withstand a summary judgment motion." *Jermosen v. Coughlin*, 877 F.Supp. 864, 867 (S.D.N.Y.1995) (citations omitted).

As the Court previously explained to plaintiff Johnson, his "own deposition testimony will not suffice to carry his burden of establishing a prima facie case." (Order dated March 12, 1997.) Johnson has failed to offer any *medical* evidence substantiating the specific limitations to which he claims he is subject due to this condition, *i.e.*, his claim that he must avoid high patient/nurse ratios due to a need to avoid stress because he is a recovering alcoholic. [FN5] Johnson therefore has failed to establish a prima facie case. *See, e.g.*, *Heilwell v. Mount Sinai Hosp.*, 32 F.3d at 723 (Plaintiff "declares that ... her disability made it impossible to work in any poorly ventilated place.... No medical proof substantiates this assertion. And, to defeat a motion for summary judgment a plaintiff cannot rely on 'conjecture or surmise....' '); *McIntosh v. Brookdale Hosp. Med. Center*, 942 F.Supp. 813, 816 (E.D.N.Y.1996) (instructing plaintiff to submit medical evidence of disability and granting summary judgment for defendant where such evidence did not show a cognizable disability); *Taylor v. Dover Elevator Sys., Inc.*, 917 F.Supp. 455, 460-61 (N.D.Miss.1996) (granting summary judgment where "the record is devoid of any summary judgment evidence, *i.e.* medical diagnosis," to support plaintiff's claim of an emotional impairment); *Farley v. Gibson Container, Inc.*, 891 F.Supp. 322, 326

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

1998 WL 236235
**(Cite as: 1998 WL 236235 (S.D.N.Y.))**

(N.D.Miss.1995) (granting summary judgment for defendant where plaintiff "presented absolutely no medical reports or other objective evidence substantiating his claim that his injury and subsequent surgery left him with a condition which rises to the level of a physical impairment.... Employers should not be expected to recognize a physical impairment solely on an employee's 'say-so' "); *Aucutt v. Six Flags Over Mid-America, Inc.,* 869 F.Supp. 736, 744 (E.D.Mo.1994) (granting defendant summary judgment where the "only evidence before the Court [was] plaintiff's unsubstantiated claim"; there were "no medical reports substantiating plaintiff's claim as to his alleged medical condition or any objective affirmative evidence that provides this Court with some indication as to exactly how plaintiff is allegedly impaired.... There is absolutely no evidence before this Court which connects plaintiff's alleged disability to any impairment of normal everyday activities or impairment of job-related duties."), *aff'd,* 85 F.3d 1311, 1318 (8th Cir.1996) (plaintiff "has not presented any evidence indicating that his angina, high blood pressure, and coronary artery disease places a significant restriction on his ability to perform any" major life activity).

FN5. The only medical evidence in the record relevant to Johnson's autoimmune hepatitis is a doctor's note explaining that he was taking medication for autoimmune hepatitis, for which he was in "biochemical remission." (Hoey Aff. Ex. T.) This provides the Court with no medical guidance as to any limitations to which Johnson may be subject due to his autoimmune hepatitis. Moreover, Johnson admitted at his deposition that his autoimmune hepatitis did not prevent him from working as an RN, or ticket taker, or any other occupation. (Johnson Dep. at 32-36.)

*9 The Court need not determine if the inability to perform "unduly stressful" work constitutes a recognizable ADA handicap. *See Gaul v. AT & T, Inc.,* 955 F.Supp. 346, 350-51 (D.N.J.1997) (holding that it is not). Johnson has presented only his "say-so," without supporting medical evidence, that his status as a recovering alcoholic requires him

to avoid work stress caused by too high a patient/nurse ratio. Accordingly, defendants are entitled to summary judgment on this basis, and the Court need not reach the parties' other arguments on the summary judgment motion.

CONCLUSION

For the reasons set forth above, the Court should grant defendants summary judgment motion.

FILING OF OBJECTIONS TO THIS REPORT
AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from receipt of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Michael B. Mukasey, 500 Pearl Street, Room 2240, and to the chambers of the undersigned, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Mukasey. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *IUE AFL-CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993), *cert. denied,* 513 U.S. 822, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992); *Small v. Secretary of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57- 59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237-38 (2d Cir.1983); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

1998 WL 236235, 1998 WL 236235 (S.D.N.Y.)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

1998 WL 213203
12 NDLR P 250
(Cite as: 1998 WL 213203 (S.D.N.Y.))

Page 1

**H**

United States District Court, S.D. New York.

James JOHNSON RN, Plaintiff,
v.
St. Clare's Hospital & Health Center, et al.,
Defendants.

**No. 96 CIV. 1425(MBM).**

April 30, 1998.

James Johnson, for Plaintiff pro se.

Barbara Hoey, Esq., Kelley Drye & Warren, New York, for Defendants.

OPINION AND ORDER

MUKASEY, D.J.

*1 James Johnson, plaintiff *pro se,* sues his former employer, St. Clare's Hospital & Health Center ("St.Clare's"), for discharging him on the basis of his disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12111 *et seq.* (1994), and the Rehabilitation Act, 29 U.S.C. § § 701 *et seq.* (1994). St. Clare's has moved for summary judgment pursuant to Fed.R.Civ.P. 56(c). Magistrate Judge Andrew J. Peck, to whom this case was referred, recommended in a Report and Recommendation dated May 13, 1997 (the "Report"), that St. Clare's motion be granted. For the reasons stated below, summary judgment is granted to St. Clare's, and plaintiff's complaint is dismissed.

I.

The following facts, viewed in the light most favorable to Johnson, are relevant to this motion: Johnson, a registered nurse, worked at St. Clare's as a part-time staff nurse from 1992 to 1995. (Johnson Rule 56.1 Statement ¶¶ 2, 4, 16) During that time, Johnson was assigned to work on Level "4C," one of St. Clare's medical/surgical units. (*Id.* ¶ 7) Level 4C accommodates as many as 22 patients at a time, and is typically staffed with three nurses: two registered nurses and a licensed nurse-practitioner. ( *Id.* ¶ 10) Although Level 4C often was filled to capacity during Johnson's shifts, Johnson and other

nurses were required on occasion to "float" to other units in the hospital when 4C was closed. (*Id.* ¶ 8)

In August 1994, Johnson was notified by the New York State Education Department ("NYSED") that he was being placed on probation for professional misconduct. (*Id.* ¶¶ 16, 18) Christine Maloney, St. Clare's Associate Vice- President of Nursing, met with Johnson in September 1994 to discuss the NYSED determination. (*Id.* ¶ 18) Johnson told Maloney that he was a recovering alcoholic, that his problems with alcohol had led to his discharge by his previous employer, New York Hospital, and that the NYSED's finding of misconduct stemmed from an incident that occurred while he was working at New York Hospital. [FN1] (*Id.*)

FN1. Johnson sued New York Hospital alleging that it also had discharged him on the basis of his alcoholism in violation of the Rehabilitation Act. *Johnson v. New York Hosp.,* No. 94 Civ. 3140, (S.D.N.Y. filed Apr. 29, 1994). On November 29, 1995, a jury rejected Johnson's claims, and that result was later affirmed on appeal. *Johnson v. New York Hosp.,* 96 F.3d 33, 34-35 (2d Cir.1996).

When Maloney asked Johnson how things were going now, Johnson responded that he was "doing okay with staying away from drinking" and that he "hadn't used alcohol since the incident in New York Hospital." (Johnson Dep. at 47, 48) Although Johnson explained that he "worked part-time ... to minimize [his] stress" (*id.* at 48), he did not ask for any modification of his nursing duties or other accommodation from St. Clare's because he is a recovering alcoholic or for any other reason. (Maloney Dep. at 152-54) Nor did Johnson mention that he suffered from any other illness at that time. (Johnson Rule 56.1 Statement ¶ 22)

Johnson has been diagnosed as alcohol dependent and has received treatment for this condition since 1991. (*Id.* ¶ 29) The treatment involves group therapy with an alcohol counselor, weekly sessions with a psychologist, and regular attendance at Alcoholics Anonymous meetings. (*Id.*) Johnson has not had a drink since August 26, 1991 (*id.* ¶ 23), and he suffers from no physical symptoms and takes

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

1998 WL 213203
12 NDLR P 250
(Cite as: 1998 WL 213203 (S.D.N.Y.))

Page 2

no medication as a result of his status as a recovering alcoholic. (*Id.* ¶¶ 24, 28) Johnson asserts that being a recovering alcoholic requires him to avoid stress, and therefore high patient/nurse ratios at St. Clare's, but he has offered no medical evidence to support this claim.

*2 Johnson also suffers from autoimmune hepatitis. (*Id.* ¶ 30) He takes medication to control this condition, and he has never been hospitalized for it. (*Id.*) This condition causes Johnson to experience mild arthritis and stiffness in his back, and although it does not restrict his movement, it does result in occasional lethargy. (Johnson Dep. at 33, 35) However, neither his autoimmune hepatitis, nor the medication he takes for it, interferes with Johnson's ability to perform his duties as a registered nurse at St. Clare's. (*Id.* at 32-36)

On September 17, 1995, Johnson was assigned to work on Level "4 McNally," one of St. Clare's other medical/surgical units, because Level 4C was closed. (Johnson Rule 56.1 Statement ¶¶ 36-37) Another registered nurse, and two nurse-practitioners, in addition to Johnson, were assigned to care for Level 4 McNally's 19 patients on that day. (Johnson Dep. at 132-33, 226) Johnson refused to accept the assignment because it was "more than [he] could safely handle." (*Id.* at 133) Johnson did not file a "Notice of Unsafe Staffing" form, which was the established procedure for addressing inadequate staffing situations at St. Clare's (Johnson Rule 56.1 Statement ¶¶ 50-51), because that procedure would have required him to work the shift first and then file a grievance with the hospital workers' union. (Johnson Dep. at 151) Again, Johnson did not mention any disability or illness when he refused his assigned shift on September 17, 1995.

On September 20, 1995, St. Clare's suspended Johnson for two days without pay as a result of this incident. (Johnson Rule 56.1 Statement ¶ 52) On October 9, 1995, Maloney, along with Marilyn Hale, Vice-President of Nursing/Patient Services at St. Clare's, met with Johnson to discuss his suspension. (Johnson Dep. at 149) According to Johnson:

At that meeting I informed Miss Maloney and Miss Hale that I didn't work part-time because I didn't need the money, I did it because I had to minimize my stresses. I informed them that I

was a recovering alcoholic and that I had autoimmune hepatitis and that I wasn't able to take an assignment that was beyond my abilities.

(*Id.* at 150) On October 17, 1995, Johnson sent a letter to St. Clare's requesting a leave of absence until the first week of December because "[t]he stress caused by floating due to our floor being closed and the recent events that lead [sic] to my suspension ... have had a negative effect on me." (Johnson Rule 56.1 Statement ¶¶ 56-57) The letter also informed St. Clare's that Johnson's "autoimmune hepatitis & other chronic illness known to the nursing dep[artment]" had made him "unable to work due to stress caused by the recent situation that lead [sic] to [his] suspension." (*Id.* ¶¶ 58-59) On October 18, 1995, St. Clare's granted Johnson's request for a leave of absence through December 8, 1995. (*Id.* ¶ 61)

On December 9, 1995, Johnson reported back to work at St. Clare's and was told that he had been assigned to work on Level "5 McNally," another medical/surgical unit containing 23 patients. (*Id.* ¶ 66) Johnson was assigned to that unit along with another registered nurse and two nurse-practitioners. (*Id.*) Again, Johnson refused the assignment, and was immediately suspended by St. Clare's. (*Id.* ¶¶ 68-69, 72) Following the incident, Johnson sent the following letter to St. Clare's:

*3 Since this was the first day for me to return to work post an incident when I informed the supervisors that I couldn't take care of more than 10 [patients] I was surprised to find out that I was placed in the same situation. The nursing office was informed that I could not in good faith take an assignment that I felt that I could not handle or that would jeopardize the [patients'] health and safety.

(Hoey Aff. Ex. Y)

On December 18, 1995, St. Clare's terminated Johnson because of his refusal to accept the assignment on December 9, 1995. (Johnson Rule 56.1 Statement ¶ 73) In a letter to Ronald Pancotti, St. Clare's Vice-President of Human Resources, also dated December 18, 1995, Johnson wrote, in full:

In the beginning of 1995 I brought it to the attention of Ms. Maloney, V.P. of Nursing at St. Clare[']s, that I was an employee with a handicap

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

1998 WL 213203
12 NDLR P 250
(Cite as: 1998 WL 213203 (S.D.N.Y.))

Page 3

within the meaning of the law. Until now I have not found it necessary to request any accommodations to make it possible for me to do my job. The purpose of this letter is to inform you that due to the change in my job description by St. Clare['Js I must now request an accommodation.

The recent situations in which the hospital has asked me to perform duties beyond my abilities and beyond contracted nurse:patient ratios is something that not only endangers my health but the health of the patients.

I know that there is something that can be done to accommodate me and fill one of your nursing positions to satisfy both our needs. I am flexible with what I need to be accommodated such as a transfer, allow me to select the position I am best suited for prior to the start of the shift or if necessary to furlough me while my unit is closed so that I am not a "float nurse," (a stressful position which I did not hire on for). This can be worked out prior to my return to work.

Please check my evaluations and you can see that I am qualified for most positions in your hospital.

(Hoey Aff. Ex. W) Johnson and St. Clare's dispute whether Johnson's December 18, 1995, letter was submitted to Pancotti before or after Johnson was terminated that same day.

On December 26, 1995, St. Clare's Vice-President and General Counsel, John Scarfone, responded to Johnson's letter of December 18, 1995:

We are not entirely clear as to the nature of your claimed "handicap" or what "accommodation" you claim to require. The only thing that we are aware of through our obligation to file reports with the State Office of Professional Discipline is that you had a problem with alcohol, which was overcome ....

As you are aware, you were terminated from your position at St. Clare's for gross misconduct, which included insubordination and abandonment of your duties. This was conduct that you had been suspended for previously on or about September 23, 1995. At no time prior to your termination did you inform the Hospital that you required any sort of "accommodation." We do not see how we could "accommodate" misconduct of the type you engaged in on December 9, 1995.

*4 In light of the above, we cannot reinstate you to your position at St. Clare's.

(Hoey Aff. Ex. X) Johnson disputes that the accommodation he requested from St. Clare's was not feasible.

On January 10, 1996, Johnson filed a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging that St. Clare's terminated him because of his disability in violation of the ADA and the Rehabilitation Act. After the EEOC issued a right-to-sue letter to Johnson on February 15, 1996, Johnson commenced the present action. St. Clare's has moved for summary judgment dismissing Johnson's complaint pursuant to Rule 56(c).

II.

As a preliminary matter, after this case was referred to Magistrate Judge Peck, Johnson asked Magistrate Judge Peck to recuse himself from further consideration of this case. Johnson alleged the following in support of his recusal motion: (i) Magistrate Judge Peck once commented to Johnson that he had "lost points" by failing to take a step in the litigation that the Magistrate Judge had expected him to take; (ii) Magistrate Judge Peck does not share Johnson's belief that St. Clare's has failed to follow applicable court rules; (iii) Magistrate Judge Peck extended congratulations to Barbara E. Hoey, Esq., on the occasion of her becoming a partner at the law firm representing St. Clare's; and (iv) Johnson's otherwise unexplained feeling that Magistrate Judge Peck is biased against him. The Magistrate Judge denied Johnson's recusal motion, and Johnson now objects to that ruling.

The governing law is contained in 28 U.S.C. §§ 144 & 455 (1994). Sections 144 and 455(b)(1) require recusal when a judge harbors personal bias or prejudice against a party. *See* 28 U.S.C. §§ 144 & 455(b)(1). Rulings are not properly considered as evidence of bias. *See United States v. El-Gabrowny,* 844 F.Supp. 955, 959 (1994), and cases cited therein. There is nothing in the actions of Magistrate Judge Peck of which Johnson now complains--taken together or considered separately--that raises even the slightest hint of the kind of personal bias or prejudice proscribed by the statutes cited above.

Section 455(a) deals with the appearance of impartiality, as opposed to the reality thereof. The

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

1998 WL 213203
12 NDLR P 250
(Cite as: 1998 WL 213203 (S.D.N.Y.))

standard is an objective one, and is applied by examining record facts and law, and then deciding whether a reasonable person knowing and understanding all of the relevant facts would recuse the judge. *See El-Gabrowny*, 844 F.Supp. at 961, and cases cited therein. No sane and reasonable person would recuse Magistrate Judge Peck based on the matters alluded to in Johnson's motion. In particular, there is nothing improper about telling a litigant he has "lost points" for failing to do something that he had been expected to do.

Moreover, Magistrate Judge Peck's civility in congratulating counsel for achieving a milestone in her career is to be commended rather than condemned. Indeed, even adversaries have been known to congratulate one another on professional achievement. Would that such conduct were more common. Therefore, Magistrate Judge Peck's denial of the recusal motion was proper and Johnson's objection to the Magistrate Judge's continued participation in this case is overruled.

III.

*5 The standard for evaluating a motion for summary judgment under Rule 56(c) is well-known and need not be repeated here. Only slightly less familiar is the three-step framework for evaluating discrimination claims established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and later refined in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), among other cases. A court applying this standard proceeds as follows:

First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Burdine*, 450 U.S. at 252 (quoting *McDonnell Douglas*, 411 U .S. at 802)). The *McDonnell Douglas* standard applies to discrimination cases

brought under both the ADA and the Rehabilitation Act. *See Fisher v. Vassar College*, 114 F.3d 1332, 1357 n. 7 (2d Cir.1997), *cert. denied*, 522 U.S. 1075, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998) (Calabresi, J., concurring in part and dissenting in part, with whom Miner, Walker, McLaughlin, Jacobs, Leval, and Parker, JJ., concur) ("The ADA is interpreted in a manner similar to Title VII, and courts have frequently invoked the familiar burden-shifting analysis of *McDonnell Douglas* in ADA cases.") (citations omitted); *Heilwell v. Mount Sinai Hosp.*, 32 F.3d 718, 721-22 (2d Cir.1994) (Rehabilitation Act); *see, e.g., Serrano v. Shield Inst. of David, Inc.*, No. 94 Civ. 6745, 1997 WL 167042, at *5 (S.D.N.Y. Apr.10, 1997) (ADA); *Collins v. Walters*, No. 82 Civ. 6014, 1984 WL 590, at *4 (S.D.N.Y. June 29, 1984) (Rehabilitation Act).

To establish a prima facie case of discrimination under these statutes, a plaintiff must demonstrate: "(1) that [he] is a handicapped person under the disability acts; (2) that [he] is otherwise qualified to perform [his] job; (3) that [he] was discharged because of [his] handicap; and, with respect to Rehabilitation Act claims; (4) that the employer is a recipient of Federal financial assistance." *Wernick v. Federal Reserve Bank of New York*, 91 F.3d 379, 383 (2d Cir.1996) (citing *Heilwell*, 32 F.3d at 722). Where, as here, the employer does not dispute that it receives federal funds, the ADA and the Rehabilitation Act generally afford employees the same level of protection against discrimination . [FN2] *See* 42 U.S.C. § 12201(a) (1994) ("Except as otherwise provided in this chapter, nothing in this chapter shall be construed to provided a lesser standard than the standards applied under title V of the Rehabilitation Act of 1973 (29 U.S.C. § 790 et seq.) or the regulations issued by Federal agencies pursuant to such title."); *see, e.g., Wernick*, 91 F.3d at 383 (analyzing ADA and Rehabilitation Act claims together).

FN2. I note that one potential difference exists between the two statutes, although it is not an issue here. The Second Circuit has repeatedly held that a plaintiff must prove that he was discharged "solely because of [his] disability" to make a prima facie showing in Rehabilitation Act cases. *See, e.g., Borkowski v. Valley*

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

*Centr. Sch. Dist.,* 63 F.3d 131, 135 (2d Cir.1995); *Sedor v. Frank,* 42 F.3d 741, 746 (2d Cir.1994). However, the Court of Appeals has never applied this more rigid standard to ADA cases, *see Glover v. City Univ. of New York,* No. 96 Civ. 7961, 1997 WL 411443, at *3 n. 8 (S.D.N.Y. July 18, 1997), although some other federal circuit courts have done so, *see, e.g., Shafer v. Preston Mem'l Hosp.,* 107 F.3d 274 (4th Cir.1997); *Despears v. Milwaukee County,* 63 F.3d 635 (7th Cir.1995), as have at least two courts in this District. *See, e.g., Kolivas v. Credit Agricole,* No. 95 Civ. 5662, 1996 WL 684167, at *3 (S.D.N.Y. Nov.26, 1995), *aff'd,* 125 F.3d 844 (2d Cir.1998) (table); *Altman v. New York City Health and Hosps. Corp.,* 903 F.Supp. 503, 508 (S.D.N.Y.1995). However, any distinction that might exist between the two statutes is of no moment where, as here, Johnson fails to make a prima facie showing that St. Clare's discharged him "because of [his] disability," *see* discussion *infra* at pp. 14-18, much less that the hospital fired him "solely because of [his] disability" as is required to state a claim under the Rehabilitation Act.

**\*6** For the purpose of establishing the first element, the statutes define "handicap" or "disability" as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being regarding as having such an impairment." 42 U.S.C. § 12101(2)(ADA); *accord* 29 U.S.C. § 706(8)(B) (Rehabilitation Act); *see Wernick,* 91 F.3d at 383. In turn, major life activity is defined as "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(l) (1998) (ADA); *accord* 45 C.F.R. § 84.3(j)(2)(ii) (1998) (Rehabilitation Act); *see Wernick,* 91 F.3d at 383.

In the Report, Magistrate Judge Peck recommended that Johnson's complaint be dismissed on the ground that Johnson had failed to prove the first element of a prima facie case, *i.e.,* that he is a disabled person under the statutes.

(Report at 16) Magistrate Judge Peck assumed that Johnson's status as a recovering alcoholic and his autoimmune hepatitis qualified as physical or mental impairments under 42 U.S.C. § 12101(2)(A) . (*Id.*) However, Magistrate Judge Peck found that Johnson is not disabled because--despite repeated requests from the Magistrate Judge--he failed to provide any medical evidence showing that either condition limits one or more of his major life activities. (*Id.*) Because Magistrate Judge Peck recommended that Johnson's complaint be dismissed on that ground, he did not consider whether Johnson had established the other elements of a prima facie case of discrimination. (*Id.* at 21)

After Magistrate Judge Peck issued the Report, the Second Circuit decided *Buckley v. Consol. Edison Co. of New York,* 127 F.3d 270, 273 (2d Cir.1997). [FN3] In *Buckley,* the Court of Appeals clarified how courts should determine disability in cases where, as here, a person claims to have been discriminated against because he is a recovering alcohol or drug addict. The *Buckley* Court held that alcohol or drug addiction "substantially limits one or more ... major life activities" and therefore may qualify as a disability under the ADA. *Id.* at 273.

> FN3. Although *Buckley* was a split decision, the dissenting judge, Judge Kearse, did not take issue with the majority's conclusion that being a recovering alcohol or drug addict is a disability within the meaning of the ADA. *See* 127 F.3d at 275 (Kearse, J., dissenting). Judge Kearse dissented on the ground that Buckley failed to establish the third element of his prima facie case, *i.e.,* that Buckley's employer discharged him because of his disability. *See id.* 127 F.3d at 276.

To qualify for this protection, a person must show that he was actually addicted to alcohol or drugs in the past--as opposed to having been a casual user of either substance--and that this addiction substantially limited one or more of his major life activities. *See Id.* at 273. If a person establishes past addition, the Court held that "recovering addicts, so long as they are not currently using drugs [or alcohol], will automatically be covered

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

1998 WL 213203
12 NDLR P 250
(Cite as: 1998 WL 213203 (S.D.N.Y.))

Page 6

under § 12101(2)(B) for having a *record* of drug [or alcohol] addiction." 127 F.3d at 273 (emphasis in original). In other words, a recovering alcoholic need not show that one or more of his major life activities is currently impaired by alcohol use in order to be protected from discrimination on the basis of his alcoholism.

*7 Here, St. Clare's does not dispute that Johnson is a recovering alcoholic. (St. Clare's Rule 56.1 Statement ¶¶ 18, 20, 21, 24) Nor does it dispute Johnson's claim that he has not had a drink since August 26, 1991, and therefore that he was sober during the entire period of his employment at St. Clare's. (*Id.* ¶ 23) It is also clear from the record that New York Hospital, Johnson's former employer, fired him in August 1991 because of an incident involving alcohol abuse. (*Id.* ¶ 18) Because he is a recovering alcoholic, and because his past addiction was severe enough to cause him to lose his job, Johnson is entitled to a finding that he has an established record of alcohol addiction. *See* 42 U.S.C. § 12101(2)(B)(ADA); *accord* 29 U.S.C. § 706(8)(B) (Rehabilitation Act); *see also Buckley,* 127 F.3d at 273. Thus, Johnson qualifies as a disabled person under both the ADA and the Rehabilitation Act. [FN4]

> FN4. I assume, perhaps contrary to fact, that Johnson's autoimmune hepatitis is a physical impairment that substantially limits one or more of his major life activities, so that this condition also qualifies as a protected disability under these statutes. *See* 42 U.S.C. § 12101(2)(A)(ADA); 29 U.S.C. § 706(8)(B) (Rehabilitation Act). This assumption does not affect the outcome of this case because Johnson cannot establish that St. Clare's discharged him on the basis of either disability, *see* discussion *infra* at pp. 14-18.

However, that Johnson has established the first element of a prima facie case does not end the inquiry; Johnson must also show that St. Clare's discharged him "because of [his] disability ...." 42 U.S.C. § 12112(a); *Wernick,* 91 F.3d at 383. Although St. Clare's knew Johnson is a recovering alcoholic and has autoimmune hepatitis, and even if

he is otherwise qualified to work as a nurse at the hospital, St. Clare's decision to fire Johnson did not violate federal law unless he was terminated because of his disabilities. To excuse Johnson from proving this element would be to convert the ADA and the Rehabilitation Act into a social insurance program for any worker who is terminated for reasons unrelated to his disability. That is not sensible, and it is not the law. *See Borkowski,* 63 F.3d at 143 (Rehabilitation Act "does not protect employees with disabilities from all adverse employment decisions, but only from discrimination on the basis of disability"); *see also Stuart v. Danka Corp.,* 986 F.Supp. 741, 744 (E.D.N.Y.1997) (ADA does not apply to wrongful discharge suit "masquerading" as discrimination claim).

To avoid summary judgment dismissing his complaint, Johnson must offer evidence sufficient for a jury to conclude that St. Clare's terminated him either because he is a recovering alcoholic or because he has autoimmune hepatitis. Johnson falls far short of meeting this burden here. As noted, although St. Clare's knew of Johnson's impairments, there is simply no evidence that it terminated him on the basis of either of them. Rather, St. Clare's terminated Johnson for the same reason that it had suspended him previously: Johnson refused to work his assigned nursing shift after having been instructed specifically to do so by his supervisor. [FN5] Federal law does not require an employer to tolerate misconduct of the type engaged in by Johnson merely because the employee is a recovering alcoholic or suffers from another disability. [FN6] *See Brennan v. New York City Police Dep't,* No. 93 Civ. 8461, 1997 WL 811543, at *5 (S.D.N.Y.1997), *aff'd,* No. 97-7779, 1998 WL 51284, at *1 (2d Cir. Feb.10, 1998) (table); *Altman,* 903 F.Supp. at 509; *see also Wilber v. Brady,* 780 F.Supp. 837, 840 (D.D.C.1992) ("The Rehabilitation Act ... is not designed to insulate [employees] from disciplinary actions which would be taken against any employee regardless of his status.").

> FN5. In an Opinion and Award dated March 21, 1998, Labor Arbitrator Bonnie Siber Weinstock determined that St. Clare's had just cause to suspend and discharge Johnson pursuant to the terms of

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

1998 WL 213203
12 NDLR P 250
**(Cite as: 1998 WL 213203 (S.D.N.Y.))**

Page 7

the collective bargaining agreement between St. Clare's and Johnson's labor union. (3/21/98 Opinion and Award at 12) In denying Johnson's grievance and upholding his termination by St. Clare's, Arbitrator Weinstock found that Johnson had engaged in misconduct and insubordination on both occasions when he refused to work his assigned shifts at the hospital. (*Id.* at 5- 7) At the parties' request, Arbitrator Weinstock did not consider the claims that are at issue here, *i.e.*, whether St. Clare's fired Johnson because of his disabilities in violation of the ADA and the Rehabilitation Act. (*Id.* at 11)

FN6. Alternatively, it could also be said that Johnson fails to establish a prima facie case of discrimination because his misconduct and insubordination rendered him not "otherwise qualified" to perform a nursing job at St. Clare's. Although courts in this District have taken this approach in cases involving certain types of employee misconduct, *see, e.g., Brennan,* 1997 WL 811543, at *5; *Altman,* 903 F.Supp. at 509, where, as here, Johnson offers no evidence whatsoever to support his claim that St. Clare's fired him because of his disability, it seems preferable to grant summary judgment on that ground.

**\*8** Johnson claims that he refused to work the shifts at issue because he is a recovering alcoholic and has autoimmune hepatitis. (Johnson Dep. at 150) More specifically, Johnson asserts that he needed to avoid high patient/nurse ratios at St. Clare's in order to minimize stress, which he claims, in turn, aggravates the conditions described above. (*Id.*) Although a plaintiff may prove that he was fired because of his disability by showing that his disability caused the conduct upon which the discharge was based, *see Borkowski* 63 F.3d at 143, Johnson fails to support a key link in this proffered chain of causation, *i.e.,* that he must avoid stress because he is a recovering alcoholic and has autoimmune hepatitis.

Johnson offers no medical evidence whatsoever to

support this claim. With respect to Johnson's alcoholism, the evidence that Johnson offers--letters from his psychiatrist (Johnson Objections to Report Ex. 2), the in-patient clinic where was treated in 1991 (*id.* Ex. 4), and an out-patient clinic where he also has received treatment (*id.* Ex. 5)--fails to indicate that Johnson is any more susceptible to stress than the average person. Nor does this evidence suggest that Johnson was likely to have a relapse had he continued to work his assigned shifts at St. Clare's. As for Johnson's autoimmune hepatitis, the only medical evidence in the record--a note from Johnson's physician--indicates that this condition is in "biochemical remission." (Hoey Aff. Ex. T)

Therefore, Johnson's evidence fails to establish the necessary link between his refusal to work the shifts at issue and either of his disabilities. *Cf. Borkowski,* 63 F.3d at 143 (plaintiff made prima facie showing by "introduc [ing] evidence, in the form of letters from a physician and a psychologist, suggesting that the inadequacies in her performance were due entirely to her disabilities"). Nor is Johnson's own testimony sufficient to carry this burden. *See Heilwell,* 32 F.3d at 723 (plaintiff's own testimony that her "disability made it impossible to work in any poorly ventilated place" insufficient to survive summary judgment motion where "[n]o medical proof substantiates this assertion."). Furthermore, Johnson's failure to present medical evidence to support his claims is properly chargeable to him--even though he is not represented by counsel in this lawsuit--because, as noted, Magistrate Judge Peck warned Johnson repeatedly that his complaint would be dismissed if he failed to come forth with such evidence. (Report at 17 n. 3, 18 n. 4) Accordingly, because no reasonable jury could find, based on this record, that St. Clare's discharged Johnson either because he is a recovering alcoholic or has autoimmune hepatitis, St. Clare's is entitled to summary judgment on Johnson's claims. *See Goenaga v. March of Dimes Birth Defect Found. .,* 51 F.3d 14, 18 (2d Cir.1995) (when defendant moves for summary judgment against a party who bears the ultimate burden of proof at trial, "the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the non-moving party's claim.").

\* \* \*

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Curry vs Goodman

3/13/2003

Arthur Schreiber



Page 1

1                      UNITED STATES DISTRICT COURT
                             DISTRICT OF CONNECTICUT
2

3      - - - - - - - - - - - - - - - x
                                                     |
4      JOHN P. CURRY,
                 Plaintiff,                          |        Case Number
5                                                             3:02 CV 1149(PCD)
       VS.                                           |
6
       ALLAN S. GOODMAN, INC.,                       |
7                Defendant.

8      - - - - - - - - - - - - - - - x
9
10

11                     DEPOSITION OF:  ARTHUR SCHREIBER

12
13
14
                      Taken before Robin L. Balletto, Registered
15     Professional Reporter, a Notary Public in and for the
       State of Connecticut, pursuant to Notice and the Federal
16     Rules of Civil Procedure, at the offices of Hayber &
       Pantuso, 221 Main Street, Hartford, Connecticut, on
17     March 13, 2003, commencing at 10:15 a.m.
18
19
20
21
22
23
                      BRANDON SMITH REPORTING SERVICE
24                           (860) 549-1850
                            44 Capitol Avenue
25               Hartford, Connecticut  06106

COPY

EXHIBIT
R-2

Curry vs Goodman

3/13/2003

Arthur Schreiber    3

Page 12

1    that the way in which employees like yourself get

2    assigned to shifts is through a bidding process; is that

3    correct?

4        A    That's correct.

5        Q    And can you explain to me your understanding

6    of how that process works?

7        A    A bid list is posted according to seniority

8    with the different designations, driver, warehouse days,

9    warehouse nights, and there is two shifts on the night

10   shift, and you pick from those according to seniority by

11   who precedes you, or you have a choice of what is left.

12       Q    Anybody over at the shop with more seniority

13   than you?

14       A    Currently two men.

15       Q    Who are they?

16       A    Fred Prass and Mike Pagano, they both work day

17   shift.

18       Q    Now, I've also learned that there are at least

19   two different fundamental roles in the warehouse at the

20   night, one is split line work and the other is solid

21   line work, would you agree with that?

22       A    There is three different --

23       Q    Oh, that's right, there is 6:00 people.

24       A    There is 6:00 shift.

25       Q    And what do the 6:00 people do?

a3da2b1c-0ed6-48ae-9746-68

Curry vs Goodman

Page 101

```
 1              CERTIFICATE OF REPORTER

 2       I, Robin L. Balletto, RPR, a Notary Public duly

 3  commissioned and qualified in and for the State of

 4  Connecticut, do hereby certify that pursuant to Notice,

 5  there came before me, on the 13th day of March, 2003, at

 6  10:15 a.m., the following named person, to wit:

 7  Arthur Schreiber, who was by me duly sworn to testify to

 8  the truth and nothing but the truth; that he was

 9  thereupon carefully examined upon his oath and his

10  examination reduced to writing under my supervision;

11  that this deposition is a true record of the testimony

12  given by the witness.

13       I further certify that I am neither attorney nor

14  counsel for, nor related to, nor employed by any of the

15  parties to the action in which this deposition is taken,

16  and further, that I am not a relative or employee of any

17  attorney or counsel employed by the parties hereto, or

18  financially interested in the action.

19

20       IN WITNESS THEREOF, I have hereunto set my hand and

21  affixed my seal this 27th day of March          ,

22  2003.

23
                            Robin L. Balletto
                            Robin L. Balletto
24                          License No. 00230

                            Notary Public

25  My Commission expires:  10/31/03
```

Brandon Smith Reporting Service